[No. 13323.   In Bank. — February 3, 1890.]

## JAMES RUSSELL, APPELLANT, v. S. A. McDOWELL, RESPONDENT.

ELECTION CONTEST — ILLEGAL VOTES — APPORTIONMENT — MALCONDUCT OF ELECTION BOARDS — REVIEW ON APPEAL. — When upon an election contest a recount of the ballots shows that a large number of illegal votes were cast, but the record on appeal does not disclose for whom they were cast, or that any of them were cast for respondent, no prejudicial error appears in a *pro rata* apportionment of the illegal votes by the superior court between the respective candidates; and the reception of such votes, though it may amount to malconduct on the part of the election boards, cannot be considered on that ground, if it does not appear in what precincts they were cast.

ID. — DEDUCTION OF ILLEGAL VOTES — BURDEN OF PROOF. — In order to justify the deduction of illegal votes from the total vote of the contestee, it devolves upon the contestant to show not only that they were illegally cast, but that they were cast for the contestee.

ID. — SPURIOUS PRINTED BALLOTS — AMENDMENT OF ELECTION LAW NOT RETROSPECTIVE. — Under the election law as it stood in 1888, before the amendment of 1889 (Stats. 1889, p. 209), while party ballots fraudulently pasted with the names of candidates of the opposite party must be counted for the candidate of the party whose ballot was cast, that law did not apply to fraudulently printed ballots of similar character; and ballots cast at the election in 1888 for a Democratic candidate for sheriff, whose name was fraudulently printed on the Republican ticket, must be counted for the Democratic candidate. The amendment of 1889 was not retrospective in its operation.

ID. — ELECTION LAW — MANDATORY AND DIRECTORY PROVISIONS — REJECTING VOTE OF PRECINCT. — It is only those provisions of the election laws relating to the time and place of holding elections, the qualifications of voters, and such others as are made essential prerequisites to the validity of an election, that are mandatory. All others are directory merely, and an honest or mistaken disregard of them, not resulting in manifest fraud, will not justify the rejection of the entire vote of a precinct; but a neglect of directory provisions designed to prevent fraudulent voting, followed by actual fraud of that character sufficient to throw a doubt on the result of the election, is ground for rejecting the entire vote of a precinct, where there is no means of purging the poll.

ID. — MALCONDUCT OF ELECTION BOARD — CONSTRUCTION OF CODE — FRAUDULENT DISREGARD OF DIRECTORY PROVISIONS — ANNOUNCING RESIDENCE OF VOTERS. — Misconduct of an election board will warrant exclusion of the entire vote of the precinct as illegal, under section 1112 of the Code of Civil Procedure, without requiring proof of particular illegal votes cast, if the board has disregarded mandatory provisions of the statute, or such directory provisions as were designed to prevent fraudulent voting, followed by such actual fraud as throws suspicion on the result, without

any means of purging the poll.   Disregard of the provisions of sections 1225 and 1226 of the Political Code, requiring the residence of voters in incorporated towns to be announced and recorded on the poll-list, followed by proof that many more persons voted than there were qualified voters actually resident on each lot in the precinct on the day of election and for thirty days previous, establishes a *prima facie* case of fraudulent voting, which justifies rejection of the entire vote of the precinct, in the absence of rebutting evidence.

EVIDENCE — PROOF OF NEGATIVE — REBUTTAL. — Slight proofs make out a *prima facie* case when a negative is to be proved.   In all such cases rebuttal is comparatively easy, and is of imperative obligation.

FINDINGS — REVIEW ON APPEAL — REVERSAL OF JUDGMENT. — When the findings are insufficient to support the judgment, or are contrary to the evidence, the appellate court cannot supply findings, but will reverse the judgment, and remand the cause for a new trial.

APPEAL from a judgment of the Superior Court of San Diego County.

The facts are stated in the opinion of the court.

*Monteith & Goodwin,* for Appellant.

*Hunsaker & Britt, Edwin Parker,* and *John M. Lucas,* for Respondent.

BEATTY, C. J.—This is an election contest.   At the general election held November 6, 1888, Russell, the contestant, was the Republican, and McDowell, the contestee, was the Democratic, candidate for sheriff of San Diego County.

According to the official canvass of the returns of the election made by the supervisors, the whole number of votes cast in the county was 8,203, of which McDowell received 4,010 votes, Russell received 3,844 votes, W. J. Gould (Prohibition) received 277 votes, and two votes were counted as scattering.   McDowell having received a certificate of election, Russell, in due time, filed his petition, in pursuance of sections 1111 et seq. of the Code of Civil Procedure, contesting his right to the office.

The grounds of contest were the first and fourth enumerated in said section, viz.: 1. Malconduct of the election boards; and 2. Illegal votes.

At the trial, the sealed packages of ballots were opened and recounted; the result being, according to the findings of the superior court, that the whole number of votes cast in the county was 8,262, distributed as follows:—

McDowell (Dem.)..................................4,035
Russell (Rep.)..................................3,865
Gould (Pro.)..................................... 275
Scattering....................................... 87

But it was found that 210 votes had been cast by persons whose names were not on the great register, and 21 votes by persons who were not residents of the wards in which they voted, making an aggregate of 231 illegal votes. Of these it was proved that two had been cast and counted for McDowell and one for Russell. As to the remaining 228 illegal votes, there was no evidence as to how they had been cast. The superior court deducted two from the vote of McDowell and one from that of Russell, on account of the illegal votes known to have been received by them respectively; and as to the remaining 228 illegal votes, they were deducted from the vote of each candidate, and from the total of the scattering votes in the same proportion that each vote respectively bore to the total vote,—with the following result, leaving—

McDowell...........................3,923 legal votes.
Russell............................3,759 legal votes.
Gould.............................. 268 legal votes.
Scattering......................... 85 legal votes.

Upon this finding of a plurality of 164 legal votes for McDowell, judgment passed in his favor, confirming his election, and for costs, from which Russell appeals, assigning error as follows:—

1. He contends that the court erred in apportioning among the candidates the 228 illegal votes as to which there was no evidence to show how they were cast, and deducting them *pro rata* from the respective scores.

But counsel does not make it very clear what other course he thinks the court ought to have taken with respect to these votes. He argues — and very justly — that such a method of disposing of illegal votes can never change the result of an election; that the different candidates must always stand in the same relative position after the *pro rata* deduction as before it, and consequently that it is a vain and nugatory proceeding to make the deduction. He also argues, with equal force, that there is but one means of proving how the illegal voter has cast his vote; that is to say, by his own testimony, which is more likely to be false than true; and consequently that the attempt to prove how illegal votes have been cast can only result in an aggravation of the fraud. But what consequence would he have us deduce from this reasoning? He does not contend that all of the illegal votes should be deducted from the vote of the candidate standing highest in the poll, and there is neither reason nor authority to support such a proposition. In truth, a court can do nothing better, in the absence of proof as to how illegal votes have been cast, than to make the apportionment as was done in this case, or to throw out the precincts at which they have been received, on the ground of malconduct of the election board. Considering such illegal votes with reference to the ground of contest mentioned in subdivision 4 of section 1111 of the Code of Civil Procedure, — the second ground of appellant's contest in this case, — they can avail the contestant only so far as he is able to prove not only that they were illegally cast, but that they were cast for the contestee. This is made clear by the provisions of section 1114 of the Code of Civil Procedure.

"Sec. 1114. Nothing in the fourth ground of contest, specified in section 1111, is to be so construed as to authorize an election to be set aside on account of illegal votes, unless it appear that a number of illegal votes has been given to the person whose right to the office is con-

tested, which, if taken from him, would reduce the number of his legal votes below the number of votes given to some other person for the same office, after deducting therefrom the illegal votes which may be shown to have been given to such other person."

In the absence of any proof, therefore, that any of these 228 illegal votes were cast for McDowell, the court certainly had no right to deduct from his vote more than his just proportion.

But the reception of illegal votes — votes of persons not on the registry lists, or not residing in the precinct where they offer to vote — may amount to malconduct on the part of the board of judges, and might come under the first ground of appellant's contest, based on subdivision 1 of section 1111 of the Code of Civil Procedure. We do not, however, understand appellant's counsel to contend that these particular illegal votes are to be considered with reference to his first ground of contest. And indeed, they could not avail him upon that ground, for it nowhere appears in what particular precinct or precincts they were cast, and if the malconduct of the judges who received them was such as to warrant the court in throwing out the entire vote of the precincts where they were received, we cannot tell what precincts would be thrown out. For aught that appears, the contestant may have received more votes than the contestee in the precincts where these illegal votes were given.

There was no error — certainly none injurious to the appellant — in the apportionment of the 228 illegal votes.

2. It was discovered by the recount that eight tickets, headed "Regular Republican Ticket," and in fact regular in all respects except that they contained the name of McDowell, instead of Russell, as candidate for sheriff, had been voted at the election. They were counted for McDowell, and the appellant contends that the court erred in not counting them for him.

Under the election law, as amended since the last

general election (Stats. 1889, p. 209), these eight ballots would be counted as appellant contends they should have been counted; but that statute has no retrospective operation, and the question is, whether, under the law as it stood in November, 1888, a court or board of canvassers would have been authorized in counting these spurious tickets as if they had been what they pretended to be, — regular Republican tickets. There was no express provision of law at that date to warrant such action. The general object of the law was, of course, to give effect to the real intention of the voter, — to secure the counting of his ballot in favor of the candidates of his choice, — and it contained many specific provisions to that end. But the general rule for ascertaining the intention of the voter was to read his ballot as printed or written, and be guided by that. To this rule there were no exceptions, save those expressly provided for. One of these, contained in section 1204 of the Political Code, related to *pasters,* — a fraud of the same kind, though clumsier and more easily detected than spurious tickets. It is surprising that the legislature did not from the beginning deal with names fraudulently *printed* on tickets exactly as it dealt with names fraudulently *pasted* on tickets.

But for some reason it did not make such provision until its last session, and therefore we cannot say that the superior court erred in counting these tickets as they were printed.

3. In support of his first ground of contest, — malconduct of the election boards, — the appellant introduced a large amount of evidence in regard to the manner of conducting the election in the first and third precincts of the third ward and the first precinct of the fifth ward of the city of San Diego. In these three precincts, respectively in the order named there were 331, 326, and 487 votes cast, making a total of 1,144, of which McDowell received 642 and Russell 472; remainder scattering.

McDowell's plurality of 170 in these three precincts was greater than his plurality in the whole county, and consequently, if they were thrown out his election would be invalidated.   Appellant contends that the superior court erred in failing to set aside and disregard the vote of these precincts for malconduct of the election boards. His counsel makes a number of separate assignments of error under this head, but they may all be conveniently considered together.

Sections 1225 and 1226 of the Political Code are as follows: —

" Sec. 1225.   The person offering to vote must hand his ballot to the inspector, or to one of the judges acting as inspector, and announce his name and the number affixed to it on the register in use at the precinct where he offers to vote; provided, that in incorporated cities and towns the said person shall also give the name of the street, avenue, or location of his residence, and the number thereof, if it be numbered, or such clear and definite description of the place of such residence as shall definitely fix the same.

" Sec. 1226.   The inspector, or judge acting as such, must receive the ballot, and before depositing it in the ballot-box, must, in an audible tone of voice, announce the name and register number; provided, that in incorporated towns and cities, the said inspector, or judge acting as such, shall also announce the residence of the person voting, and the same shall be recorded on the poll-list by the poll-clerk."

San Diego was, in November, 1888, an incorporated city, laid off into blocks and lots, with its streets numbered upon a simple and definite system.   But the poll-lists of precincts 1 and 3 of the third ward show that no record was kept of the place of residence of the voters, and presumably that they gave no place of residence.   The poll-list of the first precinct of the fifth ward shows that a record was kept of the streets or blocks where voters

resided, but not of their street numbers, in many in-
stances. In other words, they were so indefinitely located
that it could not be told upon which of eight or a dozen
lots they claimed to reside.

It is very clear that in these three precincts the elec-
tion boards disregarded the requirements of sections
1225 and 1226 of the Political Code, and in so doing were
guilty of malconduct.

This brings us to the serious question of the case:
What is the consequence of this malconduct? Must the
vote of these precincts be thrown out, thus invalidating
the election of the contestee? or may the vote of these
precincts be counted, notwithstanding the omission to
require the voters to state the street and number of their
residence?

The answer to these questions would be very plain and
easy, if nothing had been shown beyond the mere fact
that the election boards neglected to require the voters
to give their places of residence, for it is well settled that
disregard of directory provisions of election laws, in the
absence of actual fraud, is no ground for rejecting the
entire vote of a precinct, and the provisions quoted can-
not be regarded as other than directory. It is only those
provisions of the statutes relating to the time and place
of holding elections, the qualifications of voters, and such
others as are expressly made essential prerequisites to the
validity of an election, that are held to be mandatory;
all others are directory merely, and a failure to observe
them caused by honest ignorance or mistake, and not
resulting in manifest fraud, does not afford ground for
rejecting the entire vote of a precinct. But on the other
hand, it is equally well settled that neglect of directory
provisions of a statute designed to prevent fraudulent
voting, followed by actual fraud of that character suf-
ficient in extent to throw doubt on the result of the elec-
tion, is ground for rejecting the entire vote of a precinct,
if there is no means of purging the poll. We have not

time to cite and review the numerous decided cases by
which this doctrine is established, but we refer to Pine on
Elections, sections 497–509, where a full discussion of the
subject will be found. (See also chapter 17, Cooley on
Constitutional Limitations.) But it is claimed by re-
spondent that such is not the law of this state, for the
reason that the statute under which this contest is made
lays down a different rule. He relies on section 1112 of
the Code of Civil Procedure, which reads as follows:—

"Sec. 1112. No irregularity or improper conduct in
the proceedings of the judges, or any of them, is such
malconduct as avoids an election, unless the irregularity
or improper conduct is such as to procure the person
whose right to the office is contested to be declared
elected when he had not received the highest number
of legal votes."

According to respondent's construction of this section,
no amount or character of misconduct of an election
board will warrant the exclusion of the entire vote of a
precinct, but the contestant of the election must assume
the burden of showing how the illegal or fraudulent
votes were cast, and can have no relief except the deduc-
tion from his adversary's score of such illegal votes as
he may be able to prove were cast for him.

This construction cannot be maintained. If it could,
it would follow that an election held miles away from the
appointed place would be valid, contrary to the decision
in *Knowles* v. *Yates*, 31 Cal. 82; and it would follow
that the votes of a precinct must be counted, though the
election was held on a different day from that appointed,
contrary to all authority; for the language of this sec-
tion is equally applicable to mandatory as to directory
provisions of the election law, and it must receive a con-
struction reconcilable with the doctrine as to the effect
of disregarding mandatory provisions. We conclude its
meaning to be merely that the election of a county of-
ficer, as sheriff, will not be avoided unless enough pre-

cincts are excluded for malconduct of the election boards
to destroy his majority; and that the law of this state is
as it is everywhere else, and ought to be, that disregard
of mandatory requirements of the election law, or of
merely directory provisions coupled with such actual
fraud as makes the true result doubtful, is ground of
throwing out the entire vote of a precinct, where there
is no means of purging the poll.

This brings us to a consideration of the evidence of-
fered to sustain the allegation of fraud.

The evidence showed beyond any doubt that the
officers of the three city precincts above named disre-
garded the provisions of sections 1225 and 1226 of the
Political Code. The manifest object of these provisions
is to prevent fraudulent voting. Compliance with them
makes fraud difficult and improbable; disregard of them
makes fraud easy, difficult of detection and punishment,
and therefore probable. Officers of election are, like all
other persons, presumed to know the law, and their de-
liberate omission to follow directions designed to prevent
fraudulent voting certainly calls for explanation. It
casts suspicion upon their integrity, and is sufficient
*prima facie* to make out a case of fraud. No doubt
such omission is susceptible of explanation, and we are
very willing to believe that the officers of these pre-
cincts erred through ignorance of the law, and were not
actually guilty of fraudulent intent. But as the case is
presented, we cannot indulge that presumption. The
officers were not called as witnesses, as they should have
been, to prove that they acted as they did through igno-
rance, and not with fraudulent purpose; and in the
absence of any rebutting proof on this point, we feel
constrained to hold that the contestant made out a case
of malconduct on the part of the election boards.

But upon another point of more serious import the
evidence of fraud was much stronger. The contestent
called hundreds of witnesses, residents of all parts of

the three precincts in question, by whom he undertook to prove the names of all those qualified by residence to vote in those precincts. These witnesses, testifying with reference to maps of the precincts showing all the subdivisions of blocks and lots, proved the names of all male residents over twenty-one years of age who had resided on any particular lot on the day of the election, and for thirty days previous. The names of all such persons were considerably less than half of the number of votes — 1,144 — cast in the three precincts.

From this contestant argues that more than half of the votes so cast, about six hundred, were illegal and fraudulent votes. Respondent, on the other hand, argues that the proof, allowing it the utmost effect, was not sufficient to prove that any fraudulent or illegal votes were cast. For, he says, proof that a man did not reside on a particular lot on the day of the election, and for thirty days prior thereto, is not inconsistent with the supposition that he may have lived for thirty days prior to the election within the precinct, part of the time in one house and part of the time in another. Nor is it inconsistent with the supposition that he might have been living in the precinct thirty days before election, and removed to another precinct of the same county within the thirty days, in which case he would be a qualified voter of the precinct by virtue of subdivision 3, section 1239, Political Code, which reads as follows:—

" 3. A person must not be held, by reason of having moved from one precinct to another, in the same county, within thirty days prior to the election, to have lost his residence in the precinct so moved from, provided he was an elector therein on the thirtieth day prior to such election."

It is to be observed, however, with respect to this provision of the Political Code, that it was adopted while the old constitution was in force, and though perfectly valid at the time of its adoption, — the old constitution

not requiring any length of residence in a voting precinct as a prerequisite of the right to vote (Const. 1863, art. 2, sec. 1), — it has ceased to be law since the adoption of the new constitution, with which it is in direct conflict. By the new constitution (art. 2, sec. 1) residence in his election precinct for thirty days preceding the election is just as essential a condition of the right to vote as is residence in the county for ninety days, and in the state for one year.

As to the other point, however, it is true that proof that a particular person has not resided continuously on one lot or in one house for thirty days prior to an election is entirely consistent with the supposition that he may have resided in the precinct the whole period, part of the time in one house and part in another. But it is equally true that proof of this character with reference to more than half of the persons voting in a ward is not consistent with the supposition that all, or any considerable number of them, have lived in the precinct thirty days. It is not in accordance with ordinary experience that men generally move so frequently; and so, notwithstanding the flaw in plaintiff's proof, considered with reference to any particular person, we cannot avoid the conclusion, that, in the aggregate, and considered with reference to the mass of persons affected by it, it did establish a strong *prima facie* case of fraudulent voting on a large scale in these three precincts.

Moreover, it is to be considered that the contestant was assuming the difficult task of proving a negative, i. e., the want of qualification of a large number of voters, and the doctrine is well established that slight proofs make out a *prima facie* case where a negative is to be proved. In all such cases rebuttal is comparatively easy, and is consequently of imperative obligation. Here no proof in rebuttal was offered, and the evidence for contestant stands absolutely uncontradicted.

Such being the case, we are forced to the conclusion that the superior court erred in finding no material malconduct of the election boards.

For this error the judgment must be reversed. But we cannot accede to the proposition of contestant that we should pronounce a final judgment either declaring the contestant elected or avoiding the election of the contestee. There are no findings to sustain such a judgment, and we cannot supply findings. Beside, the contestee is entitled to an opportunity to show, as he may be able to do on a new trial, that, despite the irregularities complained of, there was in fact no fraud, actual or intended, on the part of the election boards, or those voting in the three precincts, whose vote the contestant seeks to exclude.

Judgment reversed and cause remanded.

Fox, J., Sharpstein, J., Paterson, J., and McFarland, J., concurred.

Mr. Justice Works did not participate in the decision of this case.

Thornton, J., concurring. — I concur in the judgment, and in all that is said in the opinion, except that which relates to the constitutionality of section 1239 of the Political Code. The section is not clearly opposed to any provision of the constitution, and in such case, the deference due to the legislature requires that the section be held constitutional. The constitution should not be so construed as to cut off the right to vote of any citizen who has resided in the state one year preceding the election, in the county ninety days, including a residence in the precinct on the thirtieth day preceding the election. The opportunity of committing fraud under such circumstances is reduced to a *minimum*, for many citizens must know of the residence of such a person who has resided in the county ninety days, and a

portion of the thirty days' limit in that precinct of the county where he offers to vote. It must be observed that the person offering to vote must have resided in the county ninety days and a portion of the thirty days to give him a right to vote, and his removal is only from one precinct to another of the same county.