(May 6, 1924.)

THOMAS JAYCOX, Appellant, v. C. A. VARNUM, Respondent.

[226 Pac. 285.]

ELECTION CONTEST—ILLEGAL VOTES—REGISTRATION — REJECTING VOTE
OF PRECINCT—INABILITY TO DETERMINE FOR WHOM VOTES CAST—
BURDEN OF PROOF.

1. Registration is a necessary condition precedent to the exercise of the right to vote.

2. When a person, otherwise qualified to vote, diligently attempts to register in the manner and time provided by law and does everything in his power to comply with the law, he cannot be deprived of his right of franchise by the failure of the officers to do their duty.

3. The vote of a precinct should not be rejected unless there has been fraud or irregularity which taints or affects the whole vote of the precinct.

4. In an election contest, based upon the ground that illegal votes were received sufficient to change the result, the burden of proof is on contestant to show for whom the illegal votes were cast.

APPEAL from the District Court of the Eleventh Judicial District, for Jerome County. Hon. O. R. Baum, Judge.

Action to contest an election. Judgment for defendant. *Affirmed.*

Bothwell & Chapman, for Appellant.

Where it appears, without contradiction, that a person possessing the legal and constitutional qualifications of a voter makes proper application for registration to the proper

officers, and has done everything within his power to comply with the law relating to registration, he cannot be deprived of his constitutional right to vote nor be declared to be an illegal voter because of the failure or the fault of such officials to properly act. (*Earl v. Lewis,* 28 Utah, 116, 77 Pac. 235; McCrary on Elections, sec. 137; *Carle v. Musgrove,* 77 Md. 174, 26 Atl. 407; *Younker v. Susong,* 173 Iowa, 663, 156 N. W. 24; *Peabody v. Burch,* 75 Kan. 543, 12 Ann. Cas. 719, 89 Pac. 1016; *Bryer v. Sevigney,* 42 R. I. 187, 106 Atl. 155; *Davis v. O'Berry,* 93 Md. 708, 50 Atl. 273; *Stewart v. Wurts,* 143 Ky. 39, 135 S. W. 434; *Tullos v. Laine,* 45 La. 333, 12 So. 508; *Stinson v. Sweeney,* 17 Nev. 361, 30 Pac. 997; *Matter of Matthews,* 143 App. Div. 561, 128 N. Y. Supp. 537; *People v. Bidelman,* 69 Hun, 596, 23 N. Y. Supp. 954; *Claybrook v. Rockingham County,* 117 N. C. 456, 23 S. E. 360; *Rawl v. McCown,* 97 S. C. 1, 81 S. E. 958; *Shepard v. Sartain,* 185 Ala. 439, 64 So. 57; *Capen v. Foster,* 12 Pick. (Mass.) 485, 23 Am. Dec. 632; *Seavitt v. McQuade,* 94 Mich. 439, 53 N. W. 944; *Taylor v. Betts,* 141 Ky. 138, 132 S. W. 162; 20 C. J. 87.)

Where it appears from the findings of the court that respondent has a vote of 795, appellant a vote of 792, and that it cannot be determined for whom three illegal votes, cast in the same precinct, were cast, it is apparent that the aggregate of such illegal votes leaves the result of the election in doubt and that in order to remove this doubt and purge the polls of such precinct of such illegal votes it must be found that appellant received at least one of such illegal votes; and in view of these facts and conditions such finding is obviously erroneous and cannot support the judgment declaring respondent to be elected. (20 C. J. 182; 9 R. C. L. 1140, sec. 140; *Chamberlain v. Woodin,* 2 Ida. 642, 23 Pac. 177; *Scholl v. Bell,* 125 Ky. 750, 102 S. W. 248; *Clarke v. McCown,* 107 S. C. 209, 92 S. E. 479.)

Since the true result of the election in Hazelton precinct is in doubt by reason of the irregularities existing in that precinct, consisting in the casting of illegal votes, and there are no means of purging the polls of said precinct of suffi-

cient of such illegal votes to make the result certain, the entire vote of Hazelton precinct should be rejected and excluded in so far as it affects this contest, with the result that appellant would have a vote of 729 and respondent a vote of 644 and appellant should be declared elected. (*Huffaker v. Edgington*, 30 Ida. 179, 163 Pac. 793; *Chamberlain v. Woodin*, 2 Ida. 642, 23 Pac. 177; *Russell v. McDowell* (Cal.), 25 Pac. 183; *Londoner v. People*, 83 Colo. 70, 26 Pac. 135; *Vigil v. Garcia*, 36 Colo. 430, 87 Pac. 543; *Scholl v. Bell*, 125 Ky. 750, 102 S. W. 248; *Seavitt v. McQuade*, 94 Mich. 439, 53 N. W. 944; *Saunders v. Hanna*, 98 Mich. 515, 57 N. W. 738; *Clarke v. McCown, supra;* 20 C. J. 182; 9 R. C. L. 1140.)

E. D. Reynolds, *Amicus Curiae*.

The legislature may prescribe qualifications, limitations and conditions for the right of suffrage additional to those prescribed in this article but shall never annul any of the provisions in this article contained. (Art. 6, sec. 4, Const.; C. S., chap. 31.)

Requirements of the registration acts which affect the result or merits of an election are mandatory, others are directory. (*People v. Johnson*, 42 Colo. 238, 94 Pac. 294; McCrary on Elections, 4th ed., par. 225; *Harper v. Dotson*, 32 Ida. 616, 187 Pac. 270; *Sizemore v. Board of Commrs.*, 36 Ida. 184, 210 Pac. 137; *People v. Earl*, 42 Colo. 238, 94 Pac. 294.)

When the legal voter has done all that the law requires at his hands, the failure of a registration officer to act neither vitiates the registration law nor deprives the legal voter who has properly applied for registration of his constitutional right. (*Earl v. Lewiston*, 28 Utah, 116, 77 Pac. 235.)

Illegal votes can avail the contestant only so far as he is able to prove, not only that they are illegally cast, but that they were cast for the contestee. (*Russell v. McDowell*, 83 Cal. 70, 23 Pac. 184; 20 C. J. 182, par. 224; 9 R. C. L. 1150, par. 141, 1163, par. 152.)

Johnson & Kroeger, for Respondent.

Registration is not one of the substantive qualifications of an elector by the provisions of sec. 2, art. 6 of the constitution. Registration is simply a regulation of the right of suffrage, and is *prima facie* evidence of the right to vote. (*Wilson v. Bartlett*, 7 Ida. 271, 62 Pac. 416; *Minges v. Board of Trustees of City of Merced*, 27 Cal. App. 15, 148 Pac. 816; 20 C. J., p. 81; *Madison v. Wade*, 88 Ga. 699, 16 S. E. 21; C. S., sec. 502.)

"In the first instance the burden is upon the party contesting an election to make a *prima facie* showing to the effect that sufficient illegal votes were cast, or illegal votes rejected, to change the result of the election, or that such serious wrong or fraud existed as to make the result of the election doubtful." (*Huffaker v. Edgington*, 30 Ida. 179, 163 Pac. 793; *Stephens v. Macey*, 49 Mont. 230, 141 Pac. 649; *Tarbox v. Sughrue*, 36 Kan. 225, 12 Pac. 935; *Goff v. Daniels*, 181 Ky. 18, 203 S. W. 853; *People v. Cicogg*, 16 Mich. 283; *Jenkins v. Hill*, 50 N. H. 140; *Dunagan v. Town of Red Rock*, 58 Okl. 218, 158 Pac. 1170; *Skain v. Milward*, 138 Ky. 200, 127 Pac. 773; *Lippencott v. Felton*, 61 N. J. L. 291, 39 Atl. 646; *Tazwell v. Davis*, 64 Or. 325, 130 Pac. 400.)

"Where certain ballots voted by alleged illiterate persons at an election were void, the contestants were not entitled for that reason to have the entire precinct rejected, but the burden was on them to show the names of the persons who thus voted, and the candidates for whom they voted." (*Browning v. Lovett* (Ky.), 94 S. W. 661.)

McCARTHY, C. J.—This action was brought to contest the election of respondent to the office of clerk of the district court and *ex-officio* auditor and recorder of Jerome county. Both parties were candidates in the general election of November 7, 1922. Ten days thereafter the board of county commissioners canvassed the returns of said election and declared respondent elected to the office in question for the term commencing the second Monday in January, 1923.

Appellant alleged that there were certain illegal votes cast in Hazelton precinct which were sufficient in number to change the result of the election. Respondent by answer denied that the votes in Hazelton precinct were illegal, and alleged that, should the court find them to be illegal, such votes were not sufficient to change the result of the election. Respondent also alleged that certain votes had been cast illegally in North Jerome and South Jerome precincts.

The court found that certain votes in all three precincts were illegal but that there were not enough to cast any doubt as to the result of said election in said precinct since the polls could be purged of the illegal votes. The action was dismissed and respondent adjudged to be duly elected to the office in question. From this judgment appeal is taken.

More particularly the facts are as follows:

The returns showed that respondent received 802 votes and appellant 798 votes. Appellant contended that 17 votes cast in Hazelton precinct were illegal in that the voters had failed to register as provided by law. Only 15 of those named in the complaint were put on the witness-stand. Respondent contended that a large number of voters in North Jerome precinct and South Jerome precinct had voted illegally. Of these only five were put on the stand. The votes actually in controversy were 20 in number. Of these three were held to be legal. No objection is made by either party to this holding. It is undisputed that the 17 other voters were sworn in on election day, without any registration. The court found that seven had voted for respondent, six for appellant and one for Hill, a third candidate who is not affected by this controversy, and that three votes should be disregarded since it was not possible to tell for whom they voted. Under the finding of the court the vote stood 795 for respondent and 792 for appellant, after deducting the number of illegal votes cast for each candidate and disregarding the other three. The seven votes found to have been cast for respondent and two of the votes cast for appellant are not in controversy as no objection to them has been

taken by either party. The controversy as presented to this court centers around the votes of Mrs. Elsie Hunt, Annie M. Comstock, Lucy Doyle, Mrs. C. W. McHenry, Eugene Branson, Nora Poole, and G. M. York. Appellant contends that the votes of Elsie Hunt and Anna Comstock were not illegal but that they were merely irregular. These two were found by the trial court to be illegal and to have been cast for appellant. Appellant also contends that there was insufficient evidence to sustain the finding that the votes of Lucy Doyle and Mrs. C. W. McHenry were cast for appellant. If these contentions are well founded then there should be but two votes deducted from the number of votes cast for appellant and the result would be that appellant would have a majority of one vote. The lower court found that illegal votes were cast in Hazelton precinct by Eugene Branson, Nora Poole and G. M. York, and that it was impossible to determine from the evidence for whom they voted for the office in question. Appellant contends that the result in Hazelton precinct was in doubt, and the court should have rejected all the votes in that precinct. If this contention were sustained by this court it would result in the finding that 729 votes had been cast for appellant and 644 for respondent.

The following are the principal specifications of error. The court erred in finding that Anna M. Comstock, who cast her vote for appellant in North Jerome precinct, was an illegal voter; in finding that Elsie Hunt, who cast her vote for appellant in South Jerome precinct, was an illegal voter; in finding that Lucy Doyle, an illegal voter in Hazelton precinct, cast her vote for appellant; in finding that Mrs. C. W. McHenry, an illegal voter in Hazelton precinct, cast her vote for appellant; in refusing to reject the vote of Hazelton precinct cast in said election; and in entering judgment in favor of respondent and against appellant.

While respondent has not perfected a cross-appeal, he contends that the court erred in holding that votes were illegal on the ground that voters were not registered. If this be true the judgment was correct, irrespective of other matters

raised.   This question, therefore, requires consideration.   Respondent contends that registration is not a condition precedent to the right to vote.

To reach a proper conclusion as to the intention of the legislature it is necessary to look into the history of the registration laws.

"Qualification of Electors.   Except as in this article otherwise provided, every male or female citizen of the United States, twenty-one years old, who has actually resided in this state or territory for six months, and in the county where he or she offers to vote, thirty days next preceding the day of election, if registered as provided by law, is a qualified elector; and until otherwise provided by the legislature, women who have the qualifications prescribed in this article may continue to hold such school offices and vote at such elections as provided by the laws of Idaho territory." (Ida. Const., art. 6, sec. 2.)

Construing this provision we have held:

"By the provisions of said section 2, article 6, registration is not one of the substantive qualifications of an elector. Registration is simply a regulation of the right of suffrage and is *prima facie* evidence of the right to vote.   The term 'elector' and 'qualified elector' are used interchangeably in the constitution and laws of the state.   The authority to fix the rule by which a majority of the qualified electors may be ascertained is with the legislature." (*Wilson v. Bartlett,* 7 Ida. 271, 62 Pac. 416.)

We have also said:

"Sec. 2, art. 6, of the constitution of this state, commits the subject of registration of voters entirely to the legislature to enact such registration law as it deems wise; provided, of course, such law in no way contravenes any constitutional right of the elector." (*Gillesby v. Board of County Commrs.,* 17 Ida. 586, 107 Pac. 71.)

The matter is thus committed to the legislature.   In the early years of statehood the legislature passed a law making registration a condition precedent to voting.   (Sess. Laws 1890–91, p. 57, sec. 44; Sess. Laws 1899, p. 33, sec. 35; R. C.,

sec. 397.) In 1913 the legislature amended the registration laws so that electors could be registered on election day. In 1917 this law was repealed and the old law re-enacted. The law now reads as follows:

"All persons offering to vote at any election are subject to challenge, as provided by the election laws, but registration of any elector's name is *prima facie* evidence of his right to vote, and no person shall vote unless he is first registered." (C. S., sec. 565.)

Thus the legislative intent clearly appears that a person must be registered to vote. *Huffaker v. Edgington,* 30 Ida. 179, 23 Pac. 184, construes the 1913 law and is not in point.

Appellant takes exception to the finding and conclusion of the trial court that Annie M. Comstock's vote for him was illegal. She had registered in Blaine county in May, 1922, and moved to Jerome October 6, 1922. On the Saturday before election she applied to the registrar of North Jerome precinct for registration and was informed by him and also by the county attorney that it would be necessary for her to obtain a transfer certificate from her former precinct in Blaine county before she could register and vote in Jerome county. She phoned for and received a transfer from Blaine county on November 6, 1922. She had applied for registration on November 4th, and was misinformed by the county officers that she needed a transfer certificate in order to be registered. She subscribed the elector's oath on November 6, 1922, and was registered as of November 4, 1922. When a person, otherwise qualified to vote, diligently attempts to register in the manner and time provided by law and does everything in his power to comply with the law he cannot be deprived of his right of franchise by the failure of the officers to do their duty.

"It has been held frequently that a strict, literal compliance with the provisions of the law as to registration will not be required in the absence of fraud, or intentional wrongdoing. If a person is a citizen, has the other qualifications of a voter and does everything required of him to register and vote, the failure of the election officers to do their part

in every detail will not deprive the citizen of the right to vote. . . . . As a general rule, statutes prescribing the duties of election officers relative to registering voters should not be so construed as to make the rights of citizens to vote depend upon a strict observance of the law by such officers." (*Huffaker v. Edgington, supra.*)

Mrs. Comstock did everything that was required of her by law, when, within the time provided for registration, she applied to the proper officials for registration. She even went further and complied with the requirements of the registrar even though these requirements were unwarranted under the statutes. The lower court erred holding that her vote was illegal.

The holding of the trial court that the vote of Mrs. Hunt was illegal was correct. She did not apply for registration until the day before election which was after the registration books had been closed. No reason was given for her lack of diligence. In fact, she made no effort to register at all, but was sought out by election officers and procured to subscribe the elector's oath and her name was enrolled by the registrar, after the statutory period for registration had closed:

"While the right of a person having the constitutional qualifications of a voter cannot be impaired, either by the legislature or the malfeasance or misfeasance of a ministerial officer, the voter himself may waive the exercise of the right, and he does so whenever he stays away from the polls, or neglects to properly apply for registration." (*Earl v. Lewis,* 28 Utah, 127, 77 Pac. 238.)

Appellant also contends that there is not sufficient evidence to sustain the findings of the lower court that the illegal votes of Lucy Doyle and Mrs. McHenry were cast for appellant. Mrs. Doyle testified that she was a Democrat, that she didn't just remember whether she voted for Mr. Varnum, that she did not vote for any of the Progressive candidates running on the ticket, and in answer to the question, "Do you know whether you voted for Mr. Jaycox or not? What

is your best recollection on that?" she said, "Well, I think I did."

Mrs. McHenry testified that if she remembered right she voted for Mr. Jaycox for clerk and recorder, that she voted a scratch ticket, that she thought there were three columns on the ticket, Republican, Democrat and Progressive, that she didn't remember if there were any others but she thought not, that she might have stated on several occasions that she did not altogether know whom she voted for, and that she wasn't positive for whom she voted for sheriff, or assessor, or treasurer, or clerk of the district court, the office in question, but her best recollection was that she voted for Mr. Jaycox, the appellant. This testimony is not as satisfactory as might be desired. However, the district court enjoyed the advantage, which we lack, of seeing and hearing the witnesses. We cannot say from this record that it was an abuse of discretion to find that these two witnesses voted for appellant. Certainly there is nothing in their testimony to show that they voted for respondent or Hill, the Republican candidate. If their best recollection should be held insufficient to prove that they voted for appellant, then the finding would have to be that it was impossible to tell for whom they voted.

Our conclusion so far changes the number of votes legally cast for appellant, as found by the lower court, by one vote. Under this ruling appellant would have 793 votes to respondent's 795, with three uncertain.

This brings us to the most important question in the case. Appellant contends that the true result of the election in Hazelton precinct is uncertain because of the illegal votes, that there is no way of purging the polls of said precinct of sufficient of such illegal votes to make the result certain, that, therefore, the entire vote of Hazelton precinct should be rejected and excluded in so far as it affects this contest, with the result that appellant would have a vote of 729 and respondent would have a vote of 644 and appellant should be declared elected. He contends that the result is uncertain because of the three uncertain illegal votes, and asks

this court to adopt the very drastic measure of rejecting the entire vote of the precinct.

In *Chamberlin v. Woody,* 2 Ida. 642, 23 Pac. 177, this court held that when an election is so fraudulent and irregular that the true result cannot be ascertained from the return of the polls they should be rejected, and the true result shown by other evidence.

In *Huffaker v. Edgington, supra,* we said:

"While the vote of a precinct may be rejected in certain instances, it is a drastic measure used only in emergencies, and should not be resorted to whenever it is possible to purge the election of irregularities without depriving citizens of their vote. Such action has the effect of punishment and invalidating the votes of loyal citizens in order to prevent the fraud and wrongdoing of dishonest persons seeking to vote illegally."

A good analysis of the problem presented and different methods by which courts have tried to solve it is found in the following note in Paine on Elections, pp. 433, 434:

"The party who demands the exclusion of votes, actually cast and canvassed for his opponent, on the ground of their illegality, must show, not only that illegal votes were cast, but also that they were canvassed for his competitor. If they were canvassed for the party making the demand, they are not to be subtracted from the vote of his opponent, upon mere proof of their illegality. That would be double robbery.

"And yet that is a possible, not to say probable, result of the rule to permit a party of make mere proof of the illegality of votes cast, and stop there, without showing for whom they were cast, or canvassed, and demand the apportionment of the fraud among the candidates. The chances are at least equal that the party making the demand, and failing to make the proper proof, will by such an apportionment, not only secure a part of the illegal votes cast and canvassed for himself, but will also cause an equal number of illegal votes, cast and canvassed for himself, to be subtracted from the poll of his competitor.

"If the proofs show that persons voted, who are not quali-
fied voters, but do not show for whom they voted, the
illegality will, as we have seen, be disregarded, when such
votes are not sufficient, in number, to affect the result of the
election. But when such illegal votes are sufficient, in num-
ber, to affect the result, the case may be one of great practi-
cal difficulty. Four distinct courses will be open to the
court, or tribunal, charged with its determination: (1) to re-
ject the entire poll, (2) to disregard the illegality, (3) to
make a *pro rata* reduction of the vote of each candidate, and
(4) to take all the illegal votes from one candidate.

"The adoption of the first course, as an inflexible rule,
would secure to the minority an easy method of destroying
a close election. The adoption of the second would secure
an equally easy method of carrying a close election. The
adoption of either of the other courses would be a purely
arbitrary act; and the result would be, not established by
the facts, but fabricated by the court; and it would, at the
same time, enable the minority to carry the election, by a
dexterous adjustment of the illegal vote to the real majority.
For illustration, if one candidate should receive 220 legal
votes and no illegal votes, but the other should receive 210
legal and 20 illegal votes, the legal majority of the first
candidate would be ten votes. But the apportionment
of the 20 illegal votes, between the two candidates, would
secure to the second candidate a fictitious majority of not
less than ten votes. Again, if the aggregate majority of a
candidate, in the district, the illegal votes, being excluded,
amount to twenty, and the illegal votes, twenty-one in num-
ber, be all taken from him the will of the majority may be
defeated.

"In the total absence of proof tending to show for whom
illegal votes, sufficient in number to affect the result, were
cast, the duty of the court would seem to be to choose, as
wisely as possible, between a disregard of the illegality and
a rejection of the entire precinct vote. There ought to be
no arbitrary presumption of law, either that all the illegal
votes were cast by the political party in the majority, or

that they were cast by different parties in proportion to their numbers. To take the illegal votes all from one candidate, or *pro rata* from several candidates, would be, not to decide, but to make a case for the parties.''

It must be borne in mind that, in this case, there were no general irregularities, no fraud, no corruption, charged or established, and that neither appellant nor respondent was shown to have been responsible for the casting of the illegal votes. The situation is merely one in which three illegal votes were cast through honest mistake and the court found it impossible to tell for whom they were cast for the office in question.

We will consider the different methods of solving the problem outlined by Paine. Respectable authorities have followed the course of making *pro rata* reduction of the vote of each candidate. (*People v. Cicott,* 16 Mich. 283, 97 Am. Dec. 141; *Chaisser v. York,* 211 Ill. 56, 71 N. E. 940; *Heyfron v. Mahoney,* 9 Mont. 497, 18 Am. St. Rep. 757, 24 Pac. 93; *Moore v. Sharp,* 98 Tenn. 491, 41 S. W. 587; *Attorney General v. May,* 99 Mich. 538, 58 N. W. 483, 25 L. R. A. 325; *Russell v. McDowell,* 83 Cal. 70, 23 Pac. 183.) This method is justly open to the criticism made by Paine. It is purely arbitrary and decides nothing.

The method of rejecting the entire vote of the precinct is also favored by some authorities. In most of the cases, however, fraud or irregularities had occurred which tainted or affected the entire vote of the precinct. (*Londoner v. People,* 15 Colo. 557, 26 Pac. 135; *Vigil v. Garcia,* 36 Colo. 430, 87 Pac. 543; *Seavitt v. McQuade,* 94 Mich. 439, 53 N. W. 944.) In *Scholl v. Bell,* 125 Ky. 750, 102 S. W. 248, the court declared that there was no election because of the illegal votes and declared the office vacant. The decision was apparently based upon a statute. In *Clark v. McCown,* 107 S. C. 209, 92 S. E. 479, the election was also set aside. In *Saunders v. Hanna,* 98 Mich. 515, 57 N. W. 738, no fraud or irregularity which tainted or affected the entire vote of the precinct appeared and yet the court rejected the entire vote of the precinct because of the uncertainty arising out

of the illegal votes. This is the one case which seems to be absolutely in point and supports appellant's contention. There is a clear distinction between cases of fraud and corruption and a case like the present. Fraud, corruption or irregularities in regard to the method of holding the election in a precinct may well affect the entire vote. The illegal acts of the three voters in the present case affected only their own votes and not those of the other voters in the precinct. The election was a county election for the election of a county officer, to wit, clerk of the court. It was held in the precincts pursuant to the statute merely for administrative convenience. It was not a precinct election. There is neither justice nor reason in rejecting all of the valid votes in Hazelton precinct merely because there were three illegal votes. There is no reason why the other votes of that precinct should be affected any more than any other votes in the county.

No sound argument can be advanced in favor of taking all the illegal votes from one candidate, another method mentioned by Paine.

There are two alternatives left: to set the election aside, or find for respondent on the ground that appellant has not made out his case. The first course has not been urged by either party, and we doubt the power of the court to declare an election void on any ground presented by this case. Our statutes provide that an election may be contested when illegal votes have been received, or legal votes rejected sufficient to change the result. (C. S., sec. 7274, subd. 6.)

C. S., sec. 7294. "The judgment of the court in cases of contested election shall confirm or annul the election according to the right of the matter; or, in case the contest is in relation to the election of some person to an office, shall declare as elected the person who shall appear to be duly elected."

Respondent contends that the contestant had the burden of proving for whom the illegal votes were cast in order to show that he was elected. This is unquestionably the general rule. In all the cases cited by respondent it appeared that contestant had not used all means within his power to prove

for whom the illegal votes were cast. It has been said that, if contestant proves the illegal votes, but is, for reasons beyond his control, unable to prove whether the votes were cast for himself or the contestee, he should not be placed at a disadvantage because of this fact. (*Scholl v. Bell, supra.*) In that case the court declared the election void, acting under statutory authority. In the present case appellant asks us to reject the entire vote of a precinct, and declare him elected. There were three candidates. The three illegal votes may have been cast for appellant or the third candidate, or divided among them. In order to overcome the *prima facie* effect of the returns, it would seem incumbent on appellant to prove not only the illegal votes, but also for whom they were cast. Both these elements of proof were required to show that the illegal votes affected the result, and that, but for them, appellant would have been elected. It would be neither just nor logical to put the contestee at a disadvantage, because contestant was unable to sustain the burden of proof which rested upon him, contestee not being responsible for that fact. The rule that the party who is seeking affirmative relief has the burden of proof is one which necessarily underlies all our procedure. A party may have a just cause, and lose the benefit of his evidence through causes not of his making and beyond his control; yet we hold he is not entitled to recover because of failure of proof. It is true that there is not a complete analogy between an election contest and the ordinary civil proceeding, because in the former the public have an interest, lacking in the latter. Nevertheless, we conclude that the general rule as to burden of proof must apply to election contests. Appellant did not sustain this burden, and failed to prove that the result of the election would have been different if the illegal votes had not been received. The court was therefore not in a position to declare that respondent was not duly elected, and that appellant was.

The judgment is affirmed, with costs to respondent.

Dunn, William A. Lee and Wm. E. Lee, JJ., concur.