(No. 6316. July 22, 1936.)

JOHN HANCOCK MUTUAL LIFE INSURANCE COM-
PANY, a Corporation, Respondent, v. Z. L. GIRARD
et al., Defendants; BERTHA C. BRESSLER, Appellant.

[64 Pac. (2d) 254.]

A. H. Oversmith for Appellant.

200

Tannahill, Durham & Hyatt, for Respondent.
Dean Driscoll for Respondent on Rehearing.

AILSHIE, J.—On May 9, 1923, Z. L., Nellie E., Frank T. and Adeline Girard executed their promissory note secured by a real estate mortgage on lands in Latah county for the sum of $16,000, in favor of the Farm Mortgage Security Company, which, for convenience, will hereinafter be referred to as the Security Company. On June 20th following the note and mortgage were assigned to the respondent, John Hancock Mutual Life Insurance Company, which will hereinafter be referred to as the Insurance Company. In October, 1927, Christopher Broeneke and wife purchased the mortgaged premises from the Girards and thereupon executed a promissory note for $5,000 secured by a second mortgage on the premises in favor of the appellant, Bertha Bressler.

On April 27, 1928, Broeneke and wife entered into a written agreement with the Insurance Company for an extension

to October 1, 1935, of the Girard note and mortgage, and by the terms of the agreement, *personally assumed and promised to pay* the note and mortgage on or before October 1, 1935. At the same time they executed eight coupon notes covering interest that would accrue up to the final maturity of the note. Default was made in the payment of the principal and interest on this extended note and mortgage and the coupons, and the Insurance Company instituted this suit in foreclosure on February 17, 1934.

Appellant, Bertha C. Bressler, answered and filed a cross-complaint. By her answer she alleged that the Insurance Company was a foreign corporation existing under the laws of the state of Massachusetts and that it was, and had been, doing business in the state of Idaho without complying with the Constitution and laws of the state in reference to foreign corporations qualifying to do business in this state. She specifically alleged that the Insurance Company had failed to comply with the provisions of sec. 10 of art. 11 of the Constitution, and secs. 29–501 and 29–502, I. C. A. Appellant also set out a note and mortgage of $5,000 executed in her favor by the Broenekes on October 7, 1927, which was past due, and prayed that she have a decree of foreclosure and that her mortgage lien be decreed prior and superior to the mortgage set up by the Insurance Company.

The case was submitted to the court on a stipulation of facts and no oral testimony was introduced. The court found against the defendants and entered a decree of foreclosure in favor of the Insurance Company. This appeal is from the judgment.

Since no oral testimony was introduced in the lower court, it becomes our duty to examine the evidence and determine the facts therefrom without reference to the findings made by the trial court. (*Roby v. Roby*, 10 Ida. 139, 77 Pac. 213; *Stoneburner v. Stoneburner*, 11 Ida. 603, 83 Pac. 938; *Cannon v. Seyboldt*, 55 Ida. 796, 48 Pac. (2d) 406.)

It is agreed that the case reduces itself to one question, namely: Was the respondent doing business in the state within the constitutional and statutory provisions?

This case is a difficult one, due largely to the indefiniteness of some of the provisions of the stipulation and the uncer-

tainty attending some of the recitals which it contains. For that reason we shall copy herein what we deem to be essential parts of the stipulation.

It seems that prior to the execution of the notes and mortgages here involved the Insurance Company and the Security Company entered into an agreement in writing which recited that the Insurance Company proposed to purchase mortgages of the Security Company or accept applications for such mortgages as it might finally approve. The Security Company was a Washington corporation which qualified to do business in Idaho and complied with the Constitution and statute with respect thereto and paid its license and other fees. The Security Company agreed to secure loans on good and marketable titles and to forward them to the Insurance Company for its acceptance or rejection. The Security Company further agreed to take care of all taxes, see that insurance was carried on buildings and improvements situated on the mortgaged lands, and to furnish regular statements to the Insurance Company, and to look after the collecting of the principal and interest and remitting the same to the Insurance Company. In pursuance of that agreement the Security Company proceeded to take applications for loans, some of which were on lands situated in the state of Idaho, of which the loan here involved was one. The course of the negotiations as carried on between the Insurance Company and the Security Company is recited in the stipulation, the material part of which is quoted in the footnote hereto:

"The Security Company used its own form of application for farm loans. Copies of this it put in the hands of local representatives (including Idaho representatives) of the Security Company. Such local representatives had no contractual relation with the Security Company. Such local representatives took on this form the prospective borrower's application for loan herein referred to as Exhibit 'C' and sent the application to the Security Company at Spokane. In some instances the borrower dealt directly with the Security Company at its Spokane office, making his application there. On receipt of the borrower's application, the Security Company caused the land to be examined by its own examiners, and, if the security offered was satisfactory and if the loan was one the Security Company thought might be proper for investment by the Insurance Company, transmitted a copy of the application to the Insurance Company at its home office

It is the contention of the Insurance Company that this case is controlled by the rule announced in *Continental Assurance Co. v. Ihler*, 53 Ida. 612, 26 Pac. (2d) 792. Respondent argues that the case at bar simply involves the purchase of negotiable paper beyond the borders of the state, in the ordinary course of commercial transactions, and that it in no way involves the doing of business within the state. If the facts of this case were similar or parallel to the facts of that case, we would not hesitate to hold that there was no "doing business" in this state in the case at bar. Such is not the case, however, as we shall presently see.

Section 10, Article 11 of the Constitution, provides as follows:

in Boston, Massachusetts, for its consideration. If the loan was not deemed one which could be sold to the Insurance Company and the Security Company found another purchaser therefor, it was negotiated to such other purchaser; otherwise the application was rejected and no loan made. If the Insurance Company gave preliminary approval, it advised the Security Company by mail or wire and the latter then made up necessary notes, coupon notes and mortgage on printed forms prepared by the Security Company and in which the Security Company was named as payee or mortgagee, and caused the same to be duly signed and executed by the borrower.

. . . . . . . . . . . . . . .

"When the loan was ready for closing, the Security Company, by its own check on a Spokane Bank remitted to the borrower or his written order the net sums due him and at the same time deposited the original notes and coupon notes, endorsed in blank by the Security Company, a copy of the loan application, and a copy of the telegram from the Insurance Company approving the loan, with a Spokane Bank as collateral for a borrowing then made from such bank by the Security Company in the principal amount of the loan. These papers were not forwarded by the Bank to the Insurance Company at that time, but were held by the Bank. The Security Company then used the funds so borrowed from the Bank to take up prior encumbrances against the land so as to make the mortgage a first lien and when all prior liens had been released, the abstract brought up to date to show same and final opinion received from counsel showing good title and Security Company's mortgage a first and valid lien, the Security Company borrowed from the pledgee bank for collection the principal note and coupon notes, issuing to the pledgee bank its receipt therefor, whereupon the Security Company wrote a letter to the Insurance Company

"No foreign corporation shall do any business in this state without having one or more known places of business, and an authorized agent or agents in the same, upon whom process may be served; and no company or corporation formed under the laws of any other country, state, or territory, shall have or be allowed to exercise or enjoy, within this state any greater rights or privileges than those possessed or enjoyed by corporations of the same or similar character created under the laws of this state."

Section 29–501, I. C. A., provides:

"Every corporation not created under the laws of this state must, before doing business in this state, file for record

transmitting for settlement complete loan and title papers, including an assignment to the Insurance Company of the recorded mortgage, in which letter the Insurance Company was instructed to deposit proceeds of the loan with the First National Bank of Boston for credit and advice of Security Company. Directly when and as the loan was finally accepted by the Insurance Company, the net proceeds were so deposited with the First National Bank of Boston for the credit of the Security Company and the Security Company notified by wire of such deposit, whereupon the Security Company issued its check on the First National Bank of Boston to pledgee bank in repayment of the borrowing made from pledgee bank against such loan together with any accrued interest thereon.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"The usual time elapsing between closing of a loan by the Security Company and remittance to the borrower and receipt by the Security Company of remittance from the Insurance Company was from four to six weeks.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Prior to 1925, the Insurance Company did not foreclose any loans in Idaho, but since 1925, the Insurance Company has foreclosed a large number of loans in Idaho counties, including Bonneville, Twin Falls, Idaho, Lewis, Nez Perce, Latah, Kootenai and other counties, and during that time, on many occasions, took deeds to Idaho properties in the name of the Insurance Company from the borrower in lieu of foreclosure, such foreclosures and deeds taken in lieu thereof totalling over $267,000.00 in principal of the loans represented. Such deeds were taken subject to the existing mortgage which, as a protection against intervening creditors of the borrower, were not released but were accepted on the understanding they were in full settlement of

with the secretary of state a copy of the articles of incorporation of said corporation, duly certified to by the secretary of state of the state in which said corporation was organized, or such other legal custodian of the corporation records of said state as is qualified under its laws to make such certified copy, and file for record a copy of such articles of incorporation, duly certified by the secretary of state of this state and bearing the indorsement of the fact and time of filing for record in his office, in the office of the county recorder of the county in this state in which is designated its principal place of business in this state.''

And sec. 29–502 provides for filing designation of statutory agent and naming principal place of business in the state.

the borrower's obligations to pay principal, interest, taxes or other charges contemplated by the notes and mortgage.

"In all cases where the Insurance Company obtained title by foreclosure proceeding or by deed, the title was taken in the name of the Insurance Company. Some of these lands were thereafter sold by the Insurance Company and deeds given to the purchasers, some were leased by the Insurance Company for cash or share rent on the usual rental basis in the vicinity, the Insurance Company executing the leases either at its Home Office or at its Spokane Loan Agency on authority from its Home Office on written applications therefor from the proposed tenant sent to the Home Office of the Insurance Company.

"The Insurance Company has from time to time since 1925 maintained suits in Idaho courts to protect its interests in lands and the rents or crop rentals where based on crop share, issues and profits thereof, on which it holds mortgages or title by deed. The Insurance Company does not own and never has owned any real or personal property in Idaho, save that resulting from its mortgages on Idaho lands and consequent foreclosure thereof, deeds taken in lieu of foreclosure, or proceeds of rentals.

. . . . . . . . . . . . .

"J. E. White of Twin Falls, Idaho, now and since July 15, 1933, has looked after the interests of the Insurance Company in lands in the vicinity of Twin Falls, Idaho, by submitting written applications for leases to the Insurance Company, collecting rents, taking crop and chattel mortgages in the Insurance Company's name to secure interest and tax delinquencies, and for his services has received 10% of rentals collected by him and 5% of interest and tax collections. During the same time, W. L. Shattuck and Eastern Idaho Trust Company of Idaho Falls, Idaho, perform the same service for the same compensation, cover-

Respondent says that "its sole business is and has been the writing of life insurance," and that "it, of necessity, must carry on many collateral efforts such, for instance, as seeking avenues for the profitable investment of premium monies paid to it by its policy holders, among which is investment in mortgage securities." That respondent is in fact an insurance company can have no bearing on this case, for the reason that it is admitted that it has never complied with the foreign corporation laws of the state of Idaho, and that it has never engaged in the writing of insurance in the state; and that "while it has never engaged in the life insurance business in Idaho, *it has invested considerable sums in mortgages in Idaho farms.*"

ing lands in the vicinity of Idaho Falls. All lands in northern Idaho counties are supervised from the Spokane office of the Insurance Company by employees of the Company who receive a salary and their expenses but no commissions, and who, under the direction of the manager of the Spokane office of the Insurance Company, travel from Spokane to and in Idaho, inspect such mortgaged or owned lands, collect delinquent taxes and interest on existing mortgage loans and take crop and chattel mortgages in the name of the Insurance Company to secure the same, arrange regarding possible leases of lands owned, collect rents thereon, arrange for necessary repairs to buildings and improvements on lands owned, and perform such other duties as are incidental to such purposes. The Insurance Company has never taken crop or chattel mortgages to secure rents of its Idaho lands so acquired.

"The Insurance Company since, to-wit, December 7, 1931, has maintained and now maintains an office in Spokane with a loan agent of the Insurance Company in charge, this office supervising all loans held by the Insurance Company in the state of Idaho and adjoining states, and also supervising and handling, subject to the approval of its Home Office, all lands owned by the Insurance Company in Idaho.

"The John Hancock Mutual Life Insurance Company is and has been during the times mentioned, licensed to do business in the State of Washington as a foreign corporation.

"Very rarely was a loan negotiated by the Security Company examined by any representative of the Insurance Company before it was closed. Sometimes if an Insurance Company representative happened to be in the vicinity in which an application for loan was pending, he would casually view the land, but in all cases the lands covered by completed loans were inspected by an inspector of the Insurance Company after the loan was completed and usually within a period of one year. After

In our decision of this case we do not deal with respondent as an "insurance company," (it has not so qualified) but we must deal with it as it appears by the record, and that is, as a company making investments in the state on mortgage securities, or in other words, as an investment company.

It is true that the Insurance Company did not come to Idaho to solicit or negotiate this loan, except in so far as it constituted the Security Company its agent for such purpose. Before securing the loan it did contract with the Security Company to secure loans for it and to give it (the Insurance Company) an option on all such loans as it might approve; and when it did accept loans secured on Idaho real estate, it procured them through this corporation which was authorized to do business in Idaho. In the meanwhile it was not engaging in this single transaction alone but was in like manner engaging in other and similar transactions.

It is argued that the note and mortgage were by their terms made payable in Spokane and that they were sold to the Insurance Company in Boston. While this is, perhaps, technically true, the note recites upon its face: "This note is made and executed under, and in all respects is to be governed by, the laws of the state of Idaho." It also shows that it was indorsed: "Pay to the order of John Hancock Mutual Life Insurance Company, without recourse. The Farm Mortgage Security Company." In the meanwhile its contract with the Security Company required *the latter company to con-*

these inspections the Insurance Company sometimes required the Security Company to assume the liability for all, or a part of a loan, in which event the Security Company would so assume to the Insurance Company, and such was done on about fifteen loans in Idaho. On three Idaho loans, after such inspection, the Insurance Company required the Security Company to repurchase the loans, which it did in the sum of about $8,000.00. All loans assigned and endorsed by the Security Company to the Insurance Company, including any loans later repurchased by the Security Company from the Insurance Company, were so assigned and endorsed at the time the loan was closed 'without recourse' on the Security Company.

"Since 1925, the Insurance Company has compromised claims for rents, interest and damages, has carried insurance on properties owned by it and paid the premiums, and made necessary improvements to property, such as repair of buildings and fences."

*tinue, throughout the life of the loan, to look after the collection of principal and interest, payment of taxes on the property, insurance on the buildings and improvements;* and even provided that it should "give its best efforts to the renewing of any and all of said loans at the request of the said John Hancock Mutual Life Insurance Company, in and on such terms as to the John Hancock Mutual Life Insurance Company shall be satisfactory." It further provided:

"And the correspondent [Security Company] agrees to furnish routine legal services in connection with any and all such loans and in connection with the conduct of the business, all without costs to the John Hancock Mutual Life Insurance Company"; and further, "The correspondent agrees to prosecute foreclosure proceedings to a sale or settlement at the request of the said John Hancock Mutual Life Insurance Company, under the securities for *any and all such loans* without costs to the said John Hancock Mutual Life Insurance Company except such case expenditures as required for attorneys not regularly in the employ of the correspondent and for court costs," etc.

■ If it be conceded, for the purposes of this consideration that the note and mortgage were originally acquired by the Insurance Company through purchase from the Security Company outside the state, we still have the Security Company as the authorized agent of the purchaser (the Insurance Company) for the performance of all subsequent acts in the state of Idaho, such as looking after and protecting the security, the payment of taxes, which involves the necessity of making and furnishing annual statements of taxable property to the taxing officers of the state, the collection of principal and interest, procuring insurance on improvements, examining and appraising the real estate mortgaged, etc. This was "doing business" (*Von Baumbach v. Sargent Land Co.,* 242 U. S. 503, 37 Sup. Ct. 201, 61 L. ed. 460; *International Harvester Co. v. Commonwealth of Kentucky,* 234 U. S. 579, 34 Sup. Ct. 944, 58 L. ed. 1479; *Moore v. Racine Rubber Co.,* 194 Ky. 106, 238 S. W. 381; to the same effect, *Peoples-Pittsburg Trust Co. v. Diebolt,* 52 Ida. 208, 13 Pac. (2d) 656.) At the same time the agent, Security Company, was duly

qualified to do business in Idaho for the purposes of all Idaho transactions.

Thus it will be seen that the Insurance Company was, by contract, availing itself of the services of a corporation, qualified to carry on and do business in the state of Idaho, for the purposes of doing a general investment business in real estate loans. When the loan matured in 1928 the Insurance Company itself negotiated a five-year extension of the loan with the Broenekes and thereby secured the additional personal liability and obligation of entirely new parties as obligors on the note, and retained the security they already had on the real estate. This in itself was doing business in the state. (*Coburn v. Coke,* 193 Ala. 364, 69 So. 574.) The prohibition of our Constitution is against doing "*any business in this state*" before compliance. In passing on an identical prohibition in the Alabama Constitution, the Supreme Court of the United States in *Chattanooga National Bldg. & Loan Assn. v. Denson,* 189 U. S. 408, 23 Sup. Ct. 630, 632, 47 L. ed. 870, said:

"The prohibition is directed to the doing of any business in the state in the exercise of corporate functions; and there can be no doubt that petitioner considered that it was exercising such functions in the state."

The same may well be said in this case.

Ever since 1925, the Insurance Company has been taking deeds to properties in various counties of the state, on which it held loans, totaling more than $267,000 in principal (see footnote); and it also appears that it has been renting and leasing these lands, collecting rents, paying taxes and insurance, selling and conveying lands, and in fact conducting a general agricultural and real estate business in lands that have been acquired through these mortgage securities. (*Adjustment Bureau, etc., v. Conley,* 44 Ida. 148, 154, 255 Pac. 414.)

While a single transaction such as the purchase of negotiable paper outside of the state (*Continental Assur. Co. v. Ihler,* 53 Ida. 612, 26 Pac. (2d) 792); or the prosecution or defense of a suit to protect lawfully acquired property interests (*War Eagle Con. Min. Co. v. Dickie,* 14 Ida. 534, 94 Pac. 1034); or the acquisition of property in this state, through

legal proceedings in the collection of a debt incurred in interstate commerce (*Foore v. Simon Piano Co.,* 18 Ida. 167, 108 Pac. 1038, Ann. Cas. 1912A, 555, Id., 1914A, 706), alone is not doing business in the state; nevertheless, an accumulation of the fruits of such transactions may very well involve or result in the doing of business. Even if it were conceded that this, as an isolated transaction, did not amount to doing business, it seems self-evident that repeated similar transactions, amounting to $267,000 investment in farm lands of the state, which a foreign corporation is and has been leasing, is clearly doing business in the state. (*Peoples-Pittsburg Trust Co. v. Diebolt, supra.*) To exempt such a corporation from a compliance with the foreign corporation laws of the state, would be a clear violation of that part of sec. 10, art. 11 of the Constitution, which provides that,

"No company or corporation formed under the laws of any other country, state, or territory, shall have or be allowed to exercise or enjoy, within this state any greater rights or privileges than those possessed or enjoyed by corporations of the same or similar character created under the laws of this state."

A domestic corporation, conducting an investment business, would have to make regular annual statements, pay corporation taxes and be subject to all the other regulations provided by state law. (Secs. 29–601–29–603, I. C. A.)

Sec. 29–505, I. C. A., which deals with the subject of a noncomplying foreign corporation taking title to real property, provides as follows:

"Such corporation cannot take or hold title to any realty within this state prior to making such filings, and any pretended deed or conveyance of real estate to such corporation prior to such filings shall be absolutely null and void."

This statute was adopted in the legislative session of 1903 (1903 Sess. Laws, p. 49). In *Dickens-West Min. Co. v. Crescent etc. Co.,* 26 Ida. 153, 141 Pac. 566, this court considered the question as to the right of a foreign corporation, which had not complied with the laws of the state so as to entitle it to do business in the state, to take and hold title to real property. After quoting the foregoing section, the court said:

"That section of the statute is mandatory, and any conveyance made to a corporation that has failed to comply with said law is, as there declared, null and void."

It will be observed from an examination of the statute that the only kind of contract, which the legislature has declared "*absolutely null and void,*" is "a deed or conveyance of real estate." A mortgage is a conveyance under the statute of this state (sec. 54–813, I. C. A.) and when made in favor of a noncomplying foreign corporation, doing business in this state, is void. In dealing with other contracts the statute only provides that no such contracts "can be sued upon or enforced in any court of this state by such corporation." (Sec. 29–504, I. C. A.; *Katz v. Herrick,* 12 Ida. 1, 86 Pac. 873; *Valley Lumber Co. v. Driessel,* 13 Ida. 662, 93 Pac. 765, 13 Ann. Cas. 63, 15 L. R. A., N. S., 299.)

The Dickens-West Min. Co. case was followed and approved in *Donaldson v. Thousand Springs Power Co.,* 29 Ida. 735, at p. 743, 162 Pac. 334, 336, and the court there said:

"It is manifest that the legislature intended that no title should pass under a conveyance to a foreign corporation purchasing real estate and engaging in business in this state before it acquired the right to do so by a compliance with the constitution and statutes of this state."

We have reached the conclusion that the Insurance Company was doing business in this state without having complied with the mandate of the Constitution (sec. 10, art. 11) and the statutes requiring a foreign corporation, before doing business in the state, to file certified copies of its articles of incorporation, designate a principal place of business and appoint a statutory agent (secs. 29–501, 29–502); and that the mortgage here sought to be foreclosed was and is void. The mortgage being void, its record would not furnish constructive notice to appellant of the existence of such mortgage. However, the question of constructive notice is of no consequence here for the reason that appellant had actual notice of respondent's mortgage, due to the fact that upon the face of her mortgage it was recited: "This mortgage is subject to a mortgage of $16,000.00 given to the Federal Land Bank." (It is admitted that naming the mortgagee as the "Federal

Land Bank'' was simply a mistake and that respondent's mortgage was intended.)

Sec. 29–504, I. C. A., provides that:

''No contract or agreement made in the name of, or for the use or benefit of, such corporation prior to the making of such filings as provided in sections 29–501 and 29–502 can be sued upon or enforced in any court of this state by such corporation.''

While the mortgage respondent seeks to foreclose was not given directly to the Insurance Company, it was undoubtedly given to the Security Company ''for the use or benefit'' of the Insurance Company and therefore falls within the prohibition of the statute above quoted. (*Donaldson v. Thousand Springs Power Co.*, 29 Ida. 735, 752–760, 162 Pac. 334.) It necessarily follows that appellant's mortgage constituted a prior lien to that claimed by respondent and, in so far as respondent is concerned, is a first mortgage on the real property covered thereby.

The judgment of foreclosure in favor of respondent Insurance Company is reversed and the cause is remanded with direction to the trial court to enter judgment in favor of appellant, decreeing her mortgage prior and superior to any claim of the respondent Insurance Company. Costs awarded in favor of appellant.

Givens, C. J., and Morgan and Holden, JJ., concur.

Budge, J., expresses no opinion.

### ON REHEARING.

#### (January 15, 1937.)

AILSHIE, J.—In this case a petition for rehearing was presented and granted and the case was again argued at the November term in Lewiston, and additional briefs have been furnished. We have made a further examination of the case and have reached the conclusion that the original opinion filed herein correctly states the law governing the case.

The contention made by respondent, that this court has heretofore held that a mortgage is not void as a conveyance

of real estate, under sec. 29–505, I. C. A., and *War Eagle Consol. Min. Co. v. Dickie,* 14 Ida. 534, 94 Pac. 1034, *Tarr v. Western Loan & Sav. Co.,* 15 Ida. 741, 99 Pac. 1049, 21 L. R. A., N. S., 707, and *Village of Heyburn v. Security Sav. & T. Co.,* 55 Ida. 732, 49 Pac. (2d) 258, is not well taken and involves a misconception of the holding of those cases.

In the War Eagle case it was distinctly pointed out that the company acquired its title to the property at a time when it was fully qualified to transact business in the state, and also prior to the adoption of the act of March 10, 1903, which was the first legislative declaration that a noncomplying foreign corporation "cannot take or hold title to any realty within this state prior to making such filings," etc.

In the Tarr case the decision turned upon the principle that "those who seek equity must first do equity," rather than on the issue of the contract being either void or voidable, this court saying:

"In the first place, the appellants filed their complaint praying for a cancellation of the mortgage on the ground that it was void because of the noncompliance of the defendant corporation with the statute. That kind of action cannot be maintained by the appellants. They cannot be heard to come into a court of equity admitting the receipt of the money and the indebtedness and asking for a cancellation of the mortgage merely on account of the noncompliance by the corporation with the foreign corporation statutes of this state. Those who seek equity must first do equity."

In both the Tarr case and the Village of Heyburn case the court said: "Such contracts are not absolutely *void* but that the corporation making such contracts is left without a remedy." This expression contained in each of the cases clearly had reference to the corporation prosecuting an action on the contract and was not said with reference to the taking or holding of title to property. In other words, that distinction was not involved, nor does it appear to have been considered or passed upon in those cases. The part of the amendment of 1903, which was there under consideration, was that now embodied in sec. 29–504, I. C. A., and not that part now contained in sec. 29–505.

It is argued that we erred in our original opinion in holding that a mortgage is a conveyance, within the meaning of sec. 54–813; and in holding that the definition of conveyance therein contained applies to sec. 29–505, with reference to foreign corporations taking title to property. It is contended that this section (54–813) only applies to the registration or recording of instruments, as the same is dealt with in chapter 8, Title 54 of the 1932 Code; and that this court so held in *Fargo v. Bennett*, 35 Ida. 359, 206 Pac. 692, wherein the court, after citing cases from other states, said:

"The decision in some of the last-mentioned cases was influenced by the statutory definition of the word 'conveyance.' We have no statutory definition of 'conveyance,' that contained in C. S., sec. 5425, being limited in its application to the chapter of the statutes relating to the recording of instruments."

That observation was unnecessary and had no bearing upon, or application to, the question passed on in the case. The question here raised was not considered in that case. Further consideration of the question and examination of the history of the enactment of this statute convinces us that the court was in error in the *dictum* contained in the Fargo case, and that the statute does apply to the whole title of *transfers, acknowledging* and *recording* of instruments.

This statute (sec. 54–813) was adopted by the first session of the territorial legislature and approved January 16, 1864. (Sess. Laws 1863–64, p. 528.)  The act containing this section was entitled, "An Act Concerning Conveyances," and contained fifty-two sections substantially covering the entire subject of transfers, acknowledgments and recording of instruments, as the same is covered by Title 54 of our 1932 Annotated Code.  Sec. 35 of the original territorial act read, *inter alia:* "The term 'conveyance,' as used in *this act,* shall be construed to embrace," etc.

The session of 1874–75 re-enacted the original act "concerning conveyances" and added thereto an extra section (sec. 3 of the latter act), prescribing the method of acknowledging and proving a conveyance made by a married woman "independent of her husband."  This latter act was ap-

proved January 12, 1875, and sec. 36 thereof read, *inter alia,* "The term 'conveyance,' as used in *this act,* shall be construed to embrace every instrument," etc.

The Fourteenth Territorial legislative session, convened in December, 1886, adopted what has since been known as the Revised Statutes of 1887. This compilation of the laws contained the substance of all the provisions of the act of 1864 "concerning conveyances," and embraced the same in what is designated as "Title VI, Transfers"; and this title in turn was divided into five chapters. The section defining conveyances was numbered 3002 and appeared in chapter 4 of this title, and reads, *inter alia,* as follows:

"The term 'conveyance' as used in this chapter, embraces every instrument in writing," etc.;

and for the first time in the history of this legislation the word "chapter" was used instead of the word "act." This change was made by the commissioners and not by the legislature.

The same statute was carried into the Revised Codes of 1909, as sec. 3161 thereof and read: "The term 'conveyance' as used in this chapter, embraces every instrument in writing," etc. The Compiled Statutes of 1919, however, changed the reference again, by embracing all the subject matter originally contained in the act of '64, entitled, "An act Concerning Conveyances," and including the substance of the whole of that act within chapter 208 of Title XLI of the new code, so that the use of the words, "in this chapter," was made to apply to the entire subject of conveyances, the same as it originally read in the act of '64. (See C. S., sec. 5425.) The section remained in this form until the adoption of the 1932 Code containing the present section 54–813. It seems clear, from the history of the section (54–813), that the legislative intent was to apply the definition of "conveyance" to the entire act and not to limit it to the recording statutes, as the compilers of the 1932 Code have apparently attempted to do.

Counsel for respondent lay stress on the fact that this court has repeatedly held that:

"A mortgage, or any contract in the nature of a mortgage, merely creates a lien, and leaves the legal title in the mort-

gagor or grantor, which can only be passed out of him by judicial sale, in a proper action under the statute.'' (*Brown v. Bryan,* 6 Ida. 1, 15, 51 Pac. 995; *Hannah v. Vensel,* 19 Ida. 796, 116 Pac. 115; *Woodmansee Estate v. Covington,* 39 Ida. 749, 230 Pac. 41; *Forbush v. San Diego Fruit etc. Co.,* 46 Ida. 231, 266 Pac. 659; *Bergen v. Johnson,* 21 Ida. 619, 123 Pac. 484.)

This court has uniformly held, and still holds, that a mortgage does not pass title to the mortgaged property. It must be remembered, however, that a mortgage creates a lien and incumbrance on the mortgaged property, and affords both a contractual and statutory basis on which absolute title may be acquired by the mortgagee. By the terms of this statute itself (sec. 54–813) the ''title to real property'' is ''affected'' by a mortgage. If duly recorded, it creates a lien and incumbrance on the property, so as to impair the mortgagor's title to the extent of the mortgage indebtedness. It was evidently for this purpose that the legislature, in enacting the transfer, acknowledgment and recording laws, declared that the term ''conveyance'' should embrace ''every instrument in writing by which any estate or interest in real property is created, alienated, *mortgaged or encumbered.*'' It was likewise, evidently, the intention of the legislature, by enacting sec. 29–505 in 1903, as an amendment to the original foreign corporation statute, to cover and include every interest in real estate embraced within the meaning of the word ''conveyance,'' as defined in sec. 54–813. Had the legislature not so intended, it might well have stopped with the use of the words, ''any pretended deed'' without adding the words ''or conveyance.''

Section 29–505 was enacted in 1903 (1903 Sess. Laws, p. 50) and reads as follows:

''Such corporation can not take or hold title to any realty within this state prior to making such filings, and any pretended deed or conveyance of real estate to such corporation prior to such filings shall be absolutely null and void.''

To exempt mortgages on real property from the provisions of this act would afford ready means of circumventing the statute and accomplishing by indirection the acquisition of titles which could not be conveyed directly by original deed.

It was evidently intended to prevent such means of avoiding the operation of this statute by the use of the words "or conveyance" added after the word "deed."

The conclusions stated in the original opinion will be the judgment of the court, and it is so ordered.

Morgan, C. J., and Holden, J., concur.

Givens, J., concurs in original opinion and opinion on rehearing, except that part of both holding the mortgage to be void.

Budge, J., dissents from this opinion and also from the original opinion.