(No. 7096. May 5, 1943.)

JOHN P. WOODRUFF, LOFTUS SURERUS, WILLIAM H. POLSON, MELTON POLSON and CHARLES A. POLSON, Respondents, v. BUTTE AND MARKET LAKE CANAL COMPANY, a corporation, Appellant.

[137 Pac. (2d) 325.]

Ralph L. Albaugh, Errol H. Hillman and John L. Bloem for appellant.

Otto E. McCutcheon for respondents.

HOLDEN, C.J.—The Butte and Market Lake Canal Company (hereinafter called the Company) irrigates approximately 20,000 acres of land in the vicinity of Roberts, in Jefferson County. Its decreed right was both late and insufficient. Notwithstanding the fact it yearly rented 15,-000 acre feet in addition to its decreed rights, it was, and still is, in great need of additional water. For the purpose of obtaining additional water the Company made an application to the Commissioner of Reclamation (hereinafter called Commissioner) of the State of Idaho, to appropriate, divert and apply to a beneficial use 25 cubic feet per second of the waters of Roberts Slough. June 11, 1936, the Commissioner approved the application and issued permit No. 18282. The approval provided:

"work to begin on or before August 10, 1936, and to continue diligently and uninterruptedly to completion, unless temporarily interrupted by circumstances over which the permit holder has no control. One-fifth of the work above specified to be completed on or before December 11, 1938. The whole of said work to be completed on or before June 11, 1941."

The estimated cost of the diversion works was placed in the application at the sum of $500.00.

Many years before, the Dairy Farms Irrigation District (now defunct), apparently seeking to appropriate the waters of this slough, constructed a dike or levee across the

channel near the river entrance and laid a large pipe through the levee at a point above the low water level of the river. At the time of the issuance of the above mentioned permit to the Company, high water, together with the action of the river, had washed part of the levee and about thirty feet of the pipe away. What this company, also seeking water, planned to do in order to obtain much needed additional water, was this: appropriate 25 cubic feet per second of the waters of the same slough, restore the levee, which it did, and then and upon the completion of its diversion works, exchange that water for a like amount of the waters of Snake River.

Following approval of the permit, A. W. Stibal, president of the company, immediately conferred with its attorney and Lynn Crandall, irrigation engineer and watermaster of District No. 36, in which Roberts Slough is located. Mr. Crandall informed appellant the levee (part of the diversion works) would have to be repaired and a gate put over the pipe to prevent water from reaching the slough.

Sometime after the issuance of permit No. 18282 to the Company, to-wit, May 22, 1940, the Commissioner approved the application of contestant John P. Woodruff to appropriate, divert and apply to beneficial use 20 cubic feet per second of the waters of Roberts Slough, and later and on June 7, 1940, the Commissioner approved another application of contestant Woodruff to appropriate, divert and apply to a beneficial use 3 cubic feet per second of the waters of that slough.

Shortly prior to May 29, 1941, the Company made application to the Commissioner to submit proof of the completion of works under permit No. 18282 theretofore issued to it, as aforesaid, pursuant to which the Commissioner "entered an order in his records requiring publication of notice of proof to be submitted before Ralph L. Albaugh, a Notary Public of the State of Idaho, at Idaho Falls, Idaho, on the 21st day of June, 1941, at 11 o'clock in the forenoon of said day," and accordingly the Company submitted proof and the proof was filed with the Commissioner. July 14, 1941, the Commissioner ordered that a hearing be had in the District Court room at the courthouse at Idaho Falls, Idaho, at 10:00 o'clock in the forenoon of July 22.

▮ June 19, 1941, contestant Woodruff filed a protest with the Commissioner against the making of any order

approving the completion of the works of the Company upon certain grounds hereinafter stated. June 29, 1941, William H. Polson, Melton Polson and Charles A. Polson also filed a protest with the Commissioner. That petition, however, is not before us on this appeal in that neither the Commissioner nor the District Court passed on the Polson petition. The above mentioned hearing, ordered by the Commissioner, as aforesaid, was had commencing July 22, 1941 at Idaho Falls, Idaho. September 11, 1941, the Commissioner rendered the following decision:

"After due consideration of all the facts involved, it is ordered that completion of works be and hereby is allowed to the Butte and Market Lake Canal Co. under permit No. 18282 in the capacity amount of sixteen and sixteenths (sic) (16.6) cubic feet per second."

November 7, 1941, an appeal from that decision was prosecuted to the District Court for Jefferson County.

April 15, 1942, it was stipulated by counsel for the respective parties the appeal from the Commissioner to the District Court should be considered and decided by that court on the record of the proceedings had before the Commissioner at Idaho Falls, Idaho, July 22, 1941. October 30, 1942, findings of fact and conclusions of law were made and filed and the following judgment entered thereon by the court:

"That the decision of the Department of Reclamation of the State of Idaho entered in said matter on or about the 11th day of September, 1941, be and it is hereby reversed and held for naught and a judgment and decree may be and it is hereby made and entered by this court cancelling permit No. 18282, which judgment the Department of Reclamation should make and enter on the records of its office."

The appeal to this court is from the judgment.

*In limine,* we point out that while the company made application to the Commissioner to submit proof of the completion of works under permit No. 18282, and that pursuant thereto the Commissioner ordered a hearing on that application, still and nevertheless the contestants (respondents here) in the proceeding so initiated, sought a cancellation of the permit in question on the grounds the Commissioner, in his approval, (a) required that work begin on or before August 10, 1936 and that it continue diligently

and uninterruptedly to completion; (b) "that the said permit holder did not do any work at all until on or about the 27th of May, 1941;" (c) that the approval required "one-fifth of the work specified in the application and permit was to be completed on or before December 11, 1938;" (d) "that none of the work described in said application and permit was completed on or before December 11, 1938 or at any other time or at all before the 11th day of June, 1941;" (e) that the company "abandoned all its rights under said permit when it failed to comply with the approval of the Department of Reclamation on the granting of said permit;" (f) "that said permit was granted subject to a strict compliance with the terms of the approval endorsed thereon by the Commissioner of Reclamation of the State of Idaho."

The District Court found the company had not complied with the provisions of the approval of its permit in the particulars alleged by contestants, to-wit:

"(a) The work was not begun on or before August 10th, 1936. (b) One fifth of the work required by the Department of Reclamation was not commenced or completed on or before December 11th, 1936. (c) That the work was not started promptly and was not continued diligently and uninterruptedly to completion. (d) That no work at all was commenced on the project under the terms of the application until on or about the 27th day of May, 1941."

Contestants had the burden of proving the allegations of the Woodruff petition in that contestants sought affirmative relief, to-wit, the cancellation of the Company's permit. As held by this court in *Jaycox v. Varnum*, 39 Ida. 78, 92, 226 P. 285: "The rule that the party who is seeking affirmative relief has the burden of proof is one which necessarily underlies all our procedure." And that is the general rule. (C. J. S. 31, Sec. 104, p. 710; 20 Am. Jur., Sec. 135, p. 138.) Did, then, contestants prove the grounds alleged in the petition for cancellation of the company's permit by a preponderance of the evidence?

We quote the pertinent testimony. Contestant John P. Woodruff testified on direct examination:

"Q. Since June eleventh, Nineteen thirty-six, how frequently have you been over on the land described as the point of diversion of the water represented by the permit

number one, eight, two, eight, two, issued to the Butte and Market Lake Canal Company?

"A. Beginning with Nineteen thirty-seven, about the middle of the summer, I would say an average of about once a month during the summer.

"Q. How do you fix that date as Thirty-seven?

"A. That was at the time at which we first made an arrangement for the use of that particular piece of property.

"Q. You have seen it more or less ever since?

"A. Yes sir.

"Q. Down to what time?

"A. To the present.

"Q. Yesterday, or today?

"A. Yesterday.

"Q. I observe, in connection with permit number one, eight, two, eight, two, that the Commissioner approved the application, and fixed the date of August tenth, Nineteen thirty-six, that the work was to begin. When was the work begun which is described in permit number one, eight, two, eight, two, if you know?

"A. May twenty-seventh, Nineteen forty-one.

"Q. You mean to say that no work was done before that date?

"A. Yes sir."

On cross-examination, he testified:

"Q. Were you over there in Thirty-six? (Referring to Roberts Slough.)

"A. In the fall of Thirty-six we drove down there— down through there, after buying this land.

"Q. Did you stop and go over to the river bank?

"A. No sir."

On re-cross examination, he testified:

"Q. Now, the summer of Nineteen thirty-six, how often did you go over there? (Again referring to Roberts Slough.)

"A. I doubt if I was off of our own properties in Thirty-six.

"Q. And in the early part of the summer of Thirty-seven—the spring and summer, how often did you go over there?

"A. I doubt if I was down on those properties."

Loftus Surerus, called by contestants, testified on direct examination:

"Q. How often were you over this ground in the time between August tenth, Nineteen thirty-six and May twenty-seventh, Nineteen forty-one, if at all?

"A. Oh, in the summer, after the first of July, Thirty-seven, about once a month.

"Q. Your first visit there was in Thirty-seven?

"A. Well, I would be fishing along the river before that.

"Q. Well, would you be there in Thirty-six—Would you be there in Nineteen thirty-six?

"A. Well, —

"Q. Or about the tenth of August, Nineteen thirty-six?

"A. Yes sir.

"Q. I suppose it would be impossible for you to fix the exact dates of your fishing trips?

"A. Only on Sundays.

"Q. And was there any evidence of any work having been done there?

"A. No.

"Q. In Nineteen thirty-six, or Nineteen thirty-seven?

"A. No sir, none.

"Q. Well, to your knowledge, when did they first commence to do any work over there?

"A. May twenty-seventh, Nineteen forty-one."

A. W. Stibal, president of the Company, testified:

"Q. And referring now to this permit, which is protestant's Exhibit A, and is numbered one, eight, two, eight, two, you will observe that it was approved by the Commissioner on June eleventh, Nineteen thirty-six. Now, what did—what was the first work you did after that time in connection with that permit?

"A. I had—

"Q. I say you. I mean, of course, the canal company.

"A. I went over and looked at the levee there by our diversion point where the river washed it out and the river water would come in and spill into the slough; and I interviewed Crandall right off—

"Q. What Crandall do you mean?

"A. Watermaster.

"Q. Do you mean Mr. Lynn Crandall of Idaho Falls?

"A. Mr. Lynn Crandall, yes sir. And I think I interviewed our attorney. And he says the first thing we've got to do we've got to keep the river water out of the slough; you can't get a right by putting the water in the slough and then putting it right back into the river. So, I had the ditch rider, or the manager of the men go to work there and reconstruct that levee. The river and the high water washed it out. There is a pipe in there, and that was mostly half taken out, or for about thirty feet. And I had that scraped up, and some rock hauled in there. And then I had a gate put over the pipe so the water couldn't get in from the river into the slough.

"Q. What kind of a pipe is that?

"A. That's a steel pipe, about thirty inches in diameter, I think; near that.

\* \* \*

"Q. You say there was rock hauled there, and this work done to build up that levee?

"A. Yes.

\* \* \*

"Q. And when was that done?

"A. That was, I think, the thirty-first of July, and the first of August—first and second.

"Q. Did you have any surveying done at that time by any engineer, or about that time?

"A. Yes, we surveyed for this permit.

"Q. And who did that for you?

"A. Mr. Black.

"Q. Do you remember what you paid him for that survey?

"A. I think it was thirty-five dollars.

"Q. Was that made for the purpose of showing you where to put your diversion works?

"A. Yes sir.

"Q. And, then, when was the next work done on this job?

"A. It was done in June or July in Thirty-seven—hauling rock.

"Q. Where was this rock hauled from?

"A. Hauled about eight mile west of Roberts. From where we hauled, about eight mile, to where we put in there in the river. About an eight-mile trip.

"Q. Who hauled that?

"A. I just don't know. I never kept track of the men that hauled it; our ditch rider takes care of that.

\* \* \*

"A. Oh, I judge there's around twenty load of rock in there, and they cost about five dollars a load to put them over there.

\* \* \*

"Q. How big is that pipe?

"A. About a thirty-inch pipe. I think it's about a thirty-inch pipe.

\* \* \*

"A. I had a gate made on the water side, on the river, so the water couldn't come out of the river into the slough.

"Q. Then, later did you have any surveying done in connection with this permit?

"A. Yes sir; we had some surveying done in Nineteen forty.

"Q. What time of the year?

"A. I think that was in the fall—October or November.

"Q. Who did that?

"A. Milt Christensen.

"Q. He is the engineer that lives at Idaho Falls?

"A. Yes sir.

"Q. And what did he charge you for that work?

"A. About seventy-eight dollars, I think it was.

"Q. And what did that consist of?

"A. Oh, that consisted of the water level of the river, and the water level of the slough, that we was checking up on, and then the diversion point in the ditch, when we made this change.

\* \* \*

"Q. Now, Mr. Christensen did about seventy-eight dollars worth of engineering work for you last fall. Did he do any more work on this job this spring?

"A. He did.

"Q. To what extent?

"A. He gave us the grade for this new ditch, and the distance, and all that, for the drag-line men.

"Q. What did he charge for that, do you remember?

"A. I think it's forty-five dollars; in the neighborhood there."

C. M. Sanders, appellant's superintendent, testified:

"Q. Did you have anything to do with this (company) permit number one, eight, two, eight, two, in the summer of Nineteen thirty-six?

"A. Well, they called me up to prepare (sic) their levee there; and I hauled rock and put on it, and scraped some dirt to fill up the hole that was washed.

"Q. Did you haul rock there during the summer of Thirty-six, or have it hauled?

"A. I had it hauled.

"Q. And did you scrape dirt in there?

"A. I scraped dirt in there.

"Q. And when was that work done?

"A. Well, it was done in the latter part of July and the first of August.

"Q. Of Nineteen thirty-six?

"A. Yes sir.

"Q. Was it done under your direction?

"A. Yes sir.

"Q. And, then, when next did you do any work in connection with this permit?

"A. Thirty-seven, the spring of Thirty-seven, along in the spring, we done a little; hauled some rock, a few rock, and put in there.

\* \* \*

"Q. And about how many loads, approximately, were hauled from there?

"A. Oh, I should judge there was twenty loads, anyway, maybe more.

\* \* \*

"Q. And what did you pay them?

"A. Paid them five dollars a day.

\* \* \*

"Q. Where were those rocks put?

"A. Put on both sides of the fill.

"Q. And would that be on the bank of the river?

"A. On the bank of the river on the one side, and on the bank of the slough on the other side.

"Q. And that work was done, I presume, under Mr. Stibal's orders? ·

"A. Yes sir."

■ Where, as in the instant proceeding, a case is heard and determined by the District Court, upon a record of proceedings had before the Commissioner of Reclamation, we are in as good position to find the facts established by the record as was the trial judge. (*Ainslie v. Idaho World Printing Co.*, 1 Ida. 641; *Roby v. Roby*, 10 Ida. 139, 77 P. 213; *Stoneburner v. Stoneburner*, 11 Ida. 603, 83 P. 938; *Van Camp v. Emery*, 13 Ida. 202, 89 P. 752; *Council Improvement Co. v. Draper*, 16 Ida. 541, 102 P. 7; *Spofford v. Spofford*, 18 Ida. 115, 108 P. 1054; *Parsons v. Wrble*, 19 Ida. 619, 115 P. 8; *Jackson v. Cowan*, 33 Ida. 525, 196 P. 216; *McKenzie v. Miller*, 35 Ida. 354, 206 P. 505; Estate of Peterson, 38 Ida. 195, 220 P. 1086; Estate of Tormey, 44 Ida. 299, 256 P. 535; *Pioneer Irr. Dist. v. American Ditch Assn.*, 50 Ida. 732, 1 P. (2d) 196; *Keyes v. Keyes*, 51 Ida. 670, 9 P. (2d) 804; *Cannon v. Seyboldt*, 55 Ida. 796 at 800, 48 P. (2d) 406; *John Hancock Mut. Life Ins. Co. v. Girard*, 57 Ida. 198, 64 P. (2d) 254; *Phipps v. Boise Street Car Co.*, 61 Ida. 740, 107 P. (2d) 148.)

We come back, now, to our question: Did contestants prove the grounds alleged in the petition for cancellation of the company's permit by a preponderance of the evidence?

■ The company's permit, it will be remembered, was issued June 11, 1936. It will be noticed contestant Woodruff testified he "was down through there," referring to the location of the diversion works, "in the fall of thirty-six," but that he did not stop to go over to the river bank. He further testified he was not off his own property in either "thirty-six" or the spring or summer of "thirty-seven." Surerus, who testified for contestants, stated, in substance, that in fishing along the river, "only on Sundays," he saw no evidence of any work having been done in either 1936 or 1937. That, of course, falls far short of proving the allegations of the petition for cancellation, by a preponderance of the evidence. On the other hand, Sanders, the Company's superintendent, testified, in substance, that "in

the latter part of July and the first part of August," 19*36* (which would be less than 60 days after the issuance of the Company's permit), he had rock hauled and put on the levee and "scraped in dirt there;" that he had twenty loads of rock hauled, "maybe more," and placed "on the bank of the river on the one side, and on the bank of the slough on the other side." Stibal, president of the Company, in substance, fully corroborated Sanders. Stibal also testified he had about thirty feet of 30-inch steel pipe installed in the course of the rebuilding of the levee; that the rock cost about five dollars a load and that it was hauled in June, 1937; that he "had a gate made on the water side, on the river, so the water couldn't come out of the river into the slough"; that the Company paid C. R. Black $35.00 for surveying for the purpose of showing where to put the diversion works, as necessary an expense as any involved in the construction of such works. This evidence establishes the fact, practically without contradiction, that the work began within 60 days after the issuance of the permit and that the company expended in the construction of the diversion works more than one-fifth of the estimated cost, prior to December 11, 1938, the date fixed by the Commissioner for the completion of one-fifth of the work. In the absence of proof to the contrary, and we find none on that point in the record, it will be assumed that one-fifth of the estimated cost of construction would, and did, complete one-fifth of the works. Furthermore, whether the construction of the diversion works began within sixty days; whether the work was prosecuted diligently and uninterruptedly up to, at least, December 11, 1938; whether one-fifth of the work was completed prior to that date, could not have prejudiced contestants in that none of them then had any interest in the waters of the slough, Woodruff not having made his first application until sometime thereafter, to-wit, May 22, 1940.

Contestants also had the burden of proving the Company had not completed its diversion works. Space does not permit a review of the evidence—it is too lengthy—it is sufficient to state, therefore, that the evidence rather decisively shows the Company completed the works within time and at a cost of approximately $3,000.00.

The judgment of the District Court is reversed and the cause remanded with directions to make and file findings of fact and conclusions of law, and enter judgment thereon, in harmony with this opinion. Costs awarded to appellants.

Ailshie and Dunlap, JJ., concur.

Budge, J., concurs in the conclusion reached.

GIVENS, J. (Concurring specially.)—I concur in the conclusion reached on the ground that appellant commenced the construction of its irrigation works within sixty days after the permit was issued and completed one-fifth within half the time allowed.